IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH DENHAM                    :          CIVIL ACTION
                                 :
             v.                  :
                                 :
CHILDREN'S HOSPITAL OF           :
PHILADELPHIA, et al.             :          NO. 19-0794

MEMORANDUM

Bartle, J.                                     July 8, 2020

          Plaintiff Dr. Joseph Denham, a pediatric
anesthesiologist,  brings this action against the Children's
Hospital of Philadelphia ("CHOP"), Children's Anesthesiology
Associates ("CAA"), and the Trustees of the University of
Pennsylvania ("Penn") for failure-to-accommodate and age and
disability discrimination in violation of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq., the Age
Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et
seq., the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§
951, et seq., and the Philadelphia Fair Practices Ordinance
("PFPO"), Phila. Code §§ 9-1101, et seq.  Dr. Denham seeks
punitive as well as compensatory damages on each claim.  Before
the Court is the motion of the defendants for summary judgment
on all claims pursuant to Rule 56 of the Federal Rules of Civil
Procedure.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A factual dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is material if it might affect the outcome of the suit under governing law.  Id. at 248.

We view the facts and draw all inferences in favor of the nonmoving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  We grant summary judgment where there is insufficient record evidence for a reasonable factfinder to find for the nonmoving party.  See Anderson, 477 U.S. at 252. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

II

The following facts are not disputed or are taken in a light favorable to Dr. Denham, the nonmoving party.  In July 2000, CHOP hired Dr. Denham as an attending pediatric

-2-

anesthesiologist in the Division of General Anesthesiology, one
of multiple divisions within CHOP's larger Department of
Anesthesiology and Critical Care Medicine.  Dr. Denham received
a contemporaneous faculty appointment with the University of
Pennsylvania Perelman School of Medicine, and, in 2011, also
became the Medical Director of the Perelman Center for Advanced
Medicine.

Dr. Denham was involved in three motor vehicle
accidents while employed at CHOP.  The first accident occurred
in 2002.  Dr. Denham severely injured his neck, left shoulder,
arm, and hand in the accident.  Dr. William Greeley, then the
Chairman of CHOP's Department of Anesthesiology and Critical
Care Medicine, permitted Dr. Denham to reduce his workload and
call schedule due to his injuries.  Dr. Denham reduced his call
schedule further after he was involved in a second accident in
2007.  He was also permitted to continue to work four days per
week.  After Dr. Denham was involved in a third accident in
2014, CHOP allowed him to modify his work schedule to three days
and no longer to be on call.[1]  Dr. Denham's physicians
recommended each of the reductions to his schedule.

In July 2016, Dr. Charles Dean Kurth took over as
Chairman of the Department of Anesthesiology and Critical Care

---

1.  The exact details of the progressive reduction in Dr.
Denham's call schedule are not contained in the record.

Medicine, at which point he met with the roughly 120 physicians and scientists in the Department.  Dr. Kurth came to learn of several inequitable arrangements whereby certain physicians in the Department were permitted to work reduced schedules and not to be on call.  These arrangements caused morale issues among some physicians and made it more difficult to manage clinical coverage in the Department.

In August 2017, Dr. Kurth met with Dr. Denham as a part of his individual meetings with the Department's faculty. Dr. Denham informed Dr. Kurth that he worked a reduced schedule due to a medical disability.  The two also discussed Dr. Denham's role as the Medical Director of the Perelman Center for Advanced Medicine.  According to Dr. Denham, during this conversation Dr. Kurth commented on his age, said he was getting tired, and advised him he should consider retiring.  Dr. Kurth disputes ever making these comments.

In 2018, Dr. Kurth introduced new employment models to the Department of Anesthesiology and Critical Care Medicine. The models were presented to Dr. Denham's Division of General Anesthesiology at a division-wide meeting on January 25, 2018. At the time, physicians in the Division of General Anesthesiology held faculty appointments with Penn which administered their benefits, paid their salaries, and issued their W-2 tax forms.  CHOP managed the day-to-day work and the

-4-

retention of these physicians and reimbursed Penn for their salaries and benefits.

The roughly 60 physicians in Dr. Denham's division were asked to select from among four new employment models: (1) full-time; (2) contractual; (3) a contractual path to retirement; and (4) part-time limited. The employment arrangement of physicians who selected the full-time model remained the same in relevant part. Physicians who opted to work a full-time work and call schedule kept their faculty appointments and continued to receive benefits and salaries through Penn.

Those who wished to work less than full time were required to choose from among the contractual, contractual path to retirement, and part-time limited employment models. The contractual model allowed physicians to work a reduced work schedule of four days per week, provided they kept a full call commitment. Physicians who selected this option retained their faculty appointments and continued to receive benefits and pro-rated salaries through Penn.

The contractual path to retirement allowed a half-time work schedule with no overnight calls. Physicians who selected this model also kept their faculty appointments and continued to receive benefits and pro-rated salaries through Penn but were required to commit to retirement within six years.

The part-time limited model required no fixed minimum
schedule or call commitment.  Physicians who selected the
part-time limited model would be paid a fixed rate per shift and
would transition from receiving pay and benefits from Penn to
receiving them from CHOP.  They would no longer be able to hold
faculty appointments with Penn or division leadership and
departmental roles such as Medical Director.

Dr. Denham was the only one of 120 faculty members in
the Department of Anesthesiology and Critical Care who refused
to participate in the process of selecting an employment model.[2]
Dr. Denham successfully evaded numerous attempts by Dr. Kurth's
assistant to set up a meeting to discuss the models.  Dr. Denham
testified at his deposition that he avoided the meeting because
he did not want to lose his Medical Director title, paid
vacation, professional expense account, and other Penn benefits
due to his disability.  He explained that from 2011 to 2017, Dr.
Philip Bailey, the Chief of the Division of General
Anesthesiology in which Dr. Denham worked, stated more than ten
times that Dr. Denham's body had taken several hits and wasn't

---

2.    Eight of the roughly 60 physicians in Dr. Denham's Division
of General Anesthesiology worked less than full time when the
new employment models were introduced.  Each selected a model.
CHOP permitted up to one year to transition into the model and
provided accommodations to address part-time physicians'
individual concerns.

what it used to be.  Dr. Bailey testified that the two were friends and he made these comments in a joking manner.

Dr. Kurth and Dr. Denham finally spoke over the phone on April 19, 2018.  Dr. Kurth attempted to explore the contractual path to retirement and part-time limited employment models with Dr. Denham.  Dr. Denham maintained that he did not fit into any of the new employment models.  He again informed Dr. Kurth that he worked three days a week and took no calls due to a medical disability.  Dr. Denham testified that Dr. Kurth told him that the only way for him to continue his employment was to select the part-time limited option.[3]  Dr. Kurth insisted that they meet in person by the end of that May.

Dr. Denham again evaded the efforts of Dr. Kurth's assistant to set up a meeting to discuss the models.  It was only after Dr. Kurth's assistant warned Dr. Denham his pay and benefits may cease that he agreed to meet on May 23, 2018.  On May 22, 2018, Dr. Denham emailed Dr. Kurth, Dr. Bailey, and CHOP's Vice President of Human Resources to inform them he was taking a medical leave of absence.[4]  That same day, Dr. Denham

---

3.    Dr. Kurth disputes giving this ultimatum.  He testified at his deposition that while the part-time limited model fit Dr. Denham best, he did not know which model Dr. Denham wanted because he refused to discuss it.

4.    Dr. Denham attached a note in which his doctor stated he could not return to work until his release by a specialist.

filed a claim against the defendants with the Equal Employment
Opportunity Commission.

Dr. Denham did not attend the May 23, 2018 meeting
with Dr. Kurth.  He has not return to work since taking medical
leave and filing his employment discrimination claim on May 22,
2018.  Dr. Denham is currently on long-term disability.

III

We first address the claims of plaintiff for
compensatory damages under the ADA, ADEA, PHRA, and PFPO.

To establish a prima facie claim for disability
discrimination under the ADA, a plaintiff must show: (1) he is a
disabled person; (2) he is otherwise qualified to perform the
essential functions of the job, with or without reasonable
accommodations; and (3) he suffered an adverse employment action
because of his disability.  Taylor v. Phoenixville Sch. Dist.,
184 F.3d 296, 306 (3d Cir. 1999).  A prima facie claim for age
discrimination under the ADEA requires a plaintiff to show that:
(1) he was at least forty years old; (2) he was qualified for
the position; (3) he suffered an adverse employment action; and
(4) the person who received the position was sufficiently
younger to support an inference of discriminatory intent.  Swain
v. City of Vineland, 457 F. App'x 107, 110 (3d Cir. 2012).

Once a plaintiff establishes a prima facie claim for
discrimination, the burden of production shifts to the employer

-8-

to articulate "a legitimate, nondiscriminatory reason" for any
adverse employment action.  Shaner v. Synthes, 204 F.3d 494, 500
(3d Cir. 2000).  If the defendant carries this burden, the
plaintiff then must have an opportunity to prove that the
reasons offered by the defendant were pretext.  Id.  The burden
of proof always remains with the plaintiff.  Id. at 500-01.

        Employment discrimination claims brought under the
PHRA and PFPO are reviewed under a comparable legal framework as
found in the ADA and ADEA.  See, e.g., Jones v. Sch. Dist. of
Phila., 198 F.3d 403, 410 (3d Cir. 1999); Taylor, 184 F.3d at
306.

        Defendants stress in their argument in support of
their summary judgment motion that Dr. Denham never suffered an
adverse employment action.  They maintain that he was never
fired or subjected to any change in the terms or conditions of
his employment.  Dr. Denham, it is undisputed, took a medical
leave of absence before he met with Dr. Kurth to discuss and
finalize his employment status.  Nevertheless, the case law
provides that an adverse action under certain circumstances may
occur before the tangible effects take place.  See Delaware
State College v. Ricks, 449 U.S. 250 (1980); Lebofsky v. City of
Phila., 394 F. App'x 935, 938 (3d Cir. 2010); Watson v. Eastman
Kodak Co., 235 F.3d 851, 852-53 (3d Cir. 2000).  It is the
Court's view, based on the present record, that it is a jury

-9-

question whether Dr. Denham suffered an adverse action under the relevant statutes.  Whether Dr. Denham can prevail on the remaining elements of these statutes is likewise for the jury as genuine disputes of material fact exist.

Thus, the motion of defendants CHOP and CAA for summary judgment on plaintiff's claims under the ADA, ADEA, PHRA, and PFPO will be denied.

IV

We next turn to Dr. Denham's claims for punitive damages under each of the ADA, ADEA, PHRA, and PFPO.  The PHRA does not provide for the recovery of punitive damages.  <u>Hoy v. Angelone</u>, 720 A.2d 745, 749 (Pa. 1998) (citing 43 P.S. § 962).

The ADA provides for the recovery of punitive damages by a claimant who demonstrates that his or her employer engaged in unlawful intentional discrimination or violated requirements concerning the provision of reasonable accommodation.  42 U.S.C. § 1981a(a)(2).  To recover punitive damages under Section 1981a, a claimant must demonstrate that his or her employer's discriminatory conduct was performed with malice or reckless indifference to his federally protected rights.  42 U.S.C. § 1981a(b)(1).  "Malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that its conduct is

discriminatory.  Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999) (internal quotations omitted).

Under the ADEA, a plaintiff may recover for liquidated damages which are punitive in nature.  Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1102 (3d Cir. 1995).  To recover liquidated damages the plaintiff must demonstrate the employer either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA."  Id. at 1099.

A plaintiff may also recover punitive damages under the PFPO.  Phila. Code § 9-1122(3)(b).  However, like under the ADA and ADEA, a plaintiff seeking to collect punitive damages under Pennsylvania law must demonstrate that the conduct of the defendant was "outrageous because of the defendant's evil motive or [its] reckless indifference to the rights of others."  Feld v. Merriam, 485 A.2d 742, 746–47 (Pa. 1984).

Denham points to the deposition testimony of Dr. Kurth, Dr. Bailey, and certain CHOP administrators in which they admit they know age and disability discrimination are unlawful. Dr. Denham argues that because these individuals knew that discrimination was unlawful and nonetheless discriminated against him, a reasonable juror could conclude that their conduct meets the standard for punitive damages.

It is undisputed that CHOP was attempting to bring order and equity to the terms and conditions of employment of

its many anesthesiologists.  In the process, Dr. Kurth or
another hospital administrator contacted each of the 120 faculty
members involved to work out new employment arrangements.  Dr.
Denham did his utmost to avoid any meeting with Dr. Kurth and
finally went on medical leave just before his meeting with Dr.
Kurth was to take place.  As noted, there exist genuine disputes
of material facts so as to preclude summary judgment in favor of
the defendants on plaintiff's claims for compensatory damages.

        The issue of punitive damages is a different matter
altogether.  The question here is whether the conduct of CHOP or
any other defendant was sufficiently flagrant to meet the
standards for punitive damages under the various statutes
asserted.  Viewing the evidence in the light most favorable to
Dr. Denham, we conclude as a matter of law that no reasonable
juror could find that he is entitled to punitive damages.  The
Court will grant summary judgment in favor of the defendants in
this regard.

V

        Neither CHOP nor CAA contests that they are Dr.
Denham's employer for purposes of this lawsuit.  However, Penn
seeks summary judgment on the ground that it cannot be held
liable as plaintiff's employer for any discriminatory conduct
alleged here.

-12-

In order to succeed on a claim for employment discrimination under either federal or state law, a plaintiff must establish an employment relationship with the defendant. See Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114, 119 (3d Cir. 2013).  When there is a question as to whether a defendant may be considered a plaintiff's employer for purposes of alleged discriminatory conduct, courts look to whether the common law of agency would recognize a master-servant relationship.  Faush v. Tuesday Morning, Inc., 808 F.3d 208, 214 (3d Cir. 2015).  Specifically, a court must determine whether the defendant had the right to control the manner and means by which the plaintiff's work was accomplished. Id.  We consider the following non-exhaustive list of factors:

> the skill required; the source of the
> instrumentalities and tools; the location of
> the work; the duration of the relationship
> between the parties; whether the hiring
> party has the right to assign additional
> projects to the hired party; the extent of
> the hired party's discretion over when and
> how long to work; the method of payment; the
> hired party's role in hiring and paying
> assistants; whether the work is part of the
> regular business of the hiring party;
> whether the hiring party is in business; the
> provision of employee benefits; and the tax
> treatment of the hired party.

Id. (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24).  The analysis generally turns on whether the defendant paid the plaintiff's salary, could hire and fire the plaintiff,

and had control over the plaintiff's daily employment
activities.  Id.  In the end, the totality of the circumstances
controls.

It is true that Penn administered Dr. Denham's
benefits, paid his salary, and issued his W-2 tax forms.
Nonetheless, CHOP hired Dr. Denham, reimbursed Penn for his
salary and benefits, had the authority to terminate him, and
managed his daily work activities.  There is no evidence that
Dr. Kurth was acting on behalf of Penn in his interactions with
Dr. Denham or that Penn was involved with or knew anything about
CHOP's alleged discriminatory conduct toward Dr. Denham.  No
reasonable juror could find that Penn is liable, as Dr. Denham's
employer, for any discrimination that occurred here.

For these reasons we will grant the motion of Penn for
summary judgment on all Dr. Denham's claims.